COURT OF
APPEALS

                                                    EIGHTH DISTRICT
OF TEXAS

                                                               EL
PASO, TEXAS

 

                                                                              )     

DANNY
NUNN,                                                  )                     No. 
08-01-00374-CR

                                                                              )

Appellant,                          )                             Appeal from

                                                                              )     

v.                                                                           )                 County Court at Law No. 4

                                                                              )

THE STATE OF TEXAS,                                     )                   of El Paso County, Texas

                                                                              )

Appellee.                           )                        (TC# 20000C16788)

 

O
P I N I O N

 

Danny
Nunn appeals his conviction for harassment. 
A jury found him guilty and the court assessed his punishment at a fine
of $2,000 and confinement for a term of 180 days.  We affirm.

FACTUAL SUMMARY

Appellant
and Lynda Harris have been divorced since June 1987.  They have one child, Jennifer Nunn.  Doris Sipes, an El
Paso attorney, has known Appellant for approximately eighteen years.  They first met when Appellant retained her to
represent him in connection with the divorce and custody proceedings in Alpine,
Texas.  Sipes
withdrew from representation after only a short time because she had been
appointed to represent Henry Lee Lucas in a high profile criminal matter.  She had no further contact with Appellant
until March 2000.








Appellant
won custody of Jennifer and she lived with him in El Paso from June 1987 until
December 1988.  She began living with her
mother in Alpine when she was five years old. 
The record does not reflect the underlying facts, but Jennifer had no
contact with her father for twelve years. 
With the encouragement of a friend, seventeen-year-old Jennifer wrote a
letter to Appellant in 1999 in an effort to establish a relationship.  Appellant responded by writing dozens of
letters to her in which he described satanic worship, prostitutes, cocaine
addicts, and his own sexual conduct with women. 
He also sent her copies of letters he had mailed to Sipes
with additional notations in the margins. 
Upset, Jennifer showed the letters to her mother.  Harris read the letters, several of which
mentioned Sipes and Carol Coyner
and accused all three women of conspiring to murder Appellant.  Harris decided to telephone Coyner because of the threats made against her life.[1]  After speaking with Coyner,
Harris faxed her a copy of a letter.  Harris also called the El Paso Police
Department and filed a harassment report.

Carol
Coyner is a publisher in El Paso.  She met Appellant in 1994 when he became a
customer of her publishing and print shop. 
They began dating in 1998 and later lived together for approximately a
year.  Appellant also began working for Coyner.  One evening,
Appellant became furious about something another employee had done and he began
ranting and raving.  In Coyner=s
words, Appellant Ajust
turned into a monster@
and she saw a side of him she had never seen before.  They broke up that same evening.  Coyner spoke with
Appellant a few weeks later, but he was verbally abusive and he continued to
behave strangely.  Coyner
made Appellant move his belongings out of her home that same evening.








Shortly
after Appellant moved out, he began making hangup
telephone calls to Coyner, calling her once or twice
a day for the next six weeks.  Coyner reported the harassing phone calls to the police and
a detective contacted Appellant in February. 
In mid-February, the telephone calls ceased, but Appellant began sending
letters to Coyner stating that he was watching her.  Coyner often saw
him sitting in his truck when she went to the post office or bank.  He also drove by her business on Doniphan
several times a day.








At
about the same time, Coyner received a telephone call
from Lynda Harris advising her of the letters Appellant had been sending to
Jennifer.  In these letters, Appellant
kept predicting that Coyner would be found dead with
a bullet in her head or that she would be run over by a truck while walking
down Doniphan.  The letters also accused Coyner of being a cocaine addict and a member of a satanic
cult.  Appellant sent copies of some of
the letters to Coyner=s
friends.  Terrified by the letters and
Appellant=s
conduct, Coyner called the El Paso Police Department
to make another report.  She also
obtained a protective order in September 2000. 
Despite the protective order, Appellant began sending e-mail messages to
Coyner.  As was
the case with the letters, Appellant repeatedly predicted that Coyner would be found dead and he accused her of being a
member of a satanic cult.      Detective Anna Soto of the El Paso Police
Department was assigned to the harassment case in January 2000.  Coyner initially
told Soto that she did not wish to prosecute Appellant but simply wanted him to
stop harassing her.  Soto telephoned
Appellant and spoke with him about Coyner=s allegations.  He admitted calling Coyner
but insisted it was only to talk to her about a W-2 form.  Soto told Appellant she would mention the W-2
form to Coyner but that he should stop calling
her.  In March 2000, Coyner
filed a new harassment report based upon the threatening letters he had sent
her.  Soto again telephoned
Appellant.  He admitted sending letters
to Coyner but told Soto that he was conducting an
investigation of a conspiracy to murder him involving Coyner,
Sipes, and the El Paso Police Department.  He went so far as to tell Soto that Coyner had put his family in grave danger and Ashe would have to pay.@

Doris
Sipes received a manila enveloped at her office
address from Appellant.  The envelope,
which was postmarked March 25, 2000, contained several letters, a Bible, and a
book of poetry written by Appellant.  The
letters accused Sipes of being a witch, having sex
with a woman, having sex with animals, hiring people to commit murder, and
engaging in satanic conspiracies.  The
Bible contained the following handwritten inscription on its presentation page:

Presented
to

Doris Sipes - El Paso, Texas Head Witch of the Satanic Cult >Hidden Hands of Death=

by

Mr. Danny Nunn - El
Paso, Texas Author of >In
the Best Interest of a Conspiracy=
and >In her
Last Day, One Nation Under God=

on

To Be Recieved [sic] By Doris Sipes on
April 14, 2000 - The Birthday of Adolph Hitler - And the Frist
[sic] Anniversary of the Columbine High School Murders.  I know who murdered my best friend Joe
Johnson - Joe Ochoa - all Satanic killings.  

The inscription
is signed by ADanny
Nunn.@  A handwritten message appears on the inside
cover of the Bible:

Doris Sipes, this book of God is for you, when you do your
satanic rituals this Easter. I know the places that they could be held, Texas
or New Mexico.  Mt.
Riley or the Teepee Ranch.  Out by Horizon on top of the mesa.  One road in and no way out.  Kind of like your one way trip to hell.  But look at it this way Doris at least you know
that you won=t freeze
to death.  We all have to meet our maker,
and we all know what he will have to say to you.  Thanks for the phone call the other day from
the fake cop, very helpful.  I know all
about the horse mutilation down in Clint. 
Gave law enforcement all the information on it about
you and your people.  Be careful
about those old tainted bon fires that might have a bomb hidden under
them.  The eyes of God will always be on
you even in the dark.  Look to the skies
when you do your rituals.  It could be a
low flying helicopter with me and law enforcement.

 

Doris, I just love
book signings, don=t
you.  Doris, you know this will go all
over the world be for [sic] you even get it.  

 








It is signed by AThe Witch Hunter, Danny Nunn.@ 
Given the statements in the letter, Sipes
became alarmed that the package contained a bomb and called the El Paso Police
Department.  On the same day that Sipes received this package, someone called in a bomb
threat and left a box across the street from Sipes= office near St. Patrick=s Cathedral.  No bomb was found by law enforcement
authorities but the threat interrupted proceedings at the church.

Yet
another letter sent to Sipes by Appellant stated:

Doris -- See ya Saturday nite at your big
ritual.  I know where you will hold
it.  Stay home if it is a cloudy
night.  You could get struck by
lightning.  God has got pretty close to
you with lightning at the church across the street from your office.  Maybe the next time he won=t miss. 


 

Nunn,
who waived his right to counsel and represented himself at trial, testified
that he had sent the letters, the book of poetry, and the Bible to Sipes.  Similarly, he
admitted making hangup phone calls to Coyner, and sending her letters and e-mail messages.  He claimed that he did not intend to scare Sipes or Coyner but was merely
attempting to investigate their involvement in a satanic cult.  The jury rejected Appellant=s defense and found him guilty as
alleged in the information.

FACTUAL SUFFICIENCY

In
his sole point of error, Appellant challenges the factual sufficiency of the
evidence to sustain his conviction for harassing Sipes.  He contends that because the State failed to
prove his motive, it failed to prove that he intended to harass Sipes by sending her these writings.

Standard of Review








When conducting a review of the factual sufficiency of the
evidence, we consider all of the evidence, both admissible and inadmissible,
but we do not view it in the light most favorable to the verdict.  Clewis v. State, 922 S.W.2d 126, 129 (Tex.Crim.App.
1996); Levario v. State, 964 S.W.2d
290, 295 (Tex.App.--El Paso 1997, no pet.).  We review the evidence weighed by the jury
that tends to prove the existence of the elemental fact in dispute and compare
it with the evidence that tends to disprove that fact.  Johnson v. State, 23 S.W.3d 1, 7 (Tex.Crim.App. 2000); Jones v. State, 944 S.W.2d 642,
647 (Tex.Crim.App. 1996), cert. denied, 522
U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997).  A defendant challenging the factual
sufficiency of the evidence may allege that the evidence is so
weak as to be clearly wrong and manifestly unjust, or in a case where the
defendant has offered contrary evidence, he may argue that the finding of guilt
is against the great weight and preponderance of the evidence.  See Johnson, 23
S.W.3d at 11.  Although we are
authorized to set aside the fact finder=s
determination under either of these two circumstances, our review must employ
appropriate deference and should not intrude upon the fact finder=s role as the sole judge of the weight
and credibility given to any evidence presented at trial.  See Johnson, 23
S.W.3d at 7.  We are not free to
reweigh the evidence and set aside a verdict merely because we feel that a
different result is more reasonable.  Cain v. State, 958 S.W.2d 404, 407 (Tex.Crim.App.
1997); Clewis, 922 S.W.2d at 135.

Elements of the Offense








A
person commits the offense of harassment if, with intent to harass, annoy,
alarm, abuse, torment, or embarrass another, he initiates communication in
writing and in the course of the communication makes a comment, request,
suggestion, or proposal that is obscene. 
Tex.Pen.Code Ann. '
42.07(a)(1)(Vernon Supp. 2002).  For purposes of this section, Aobscene@
means containing a patently offensive description of or a solicitation to
commit an ultimate sex act, including sexual intercourse, masturbation,
cunnilingus, fellatio, or anilingus, or a description
of an excretory function.  Tex.Pen.Code Ann. '
42.07(b)(3).  A
person also commits harassment if, with intent to harass, annoy, alarm, abuse,
torment, or embarrass another, he threatens, by telephone or in writing, in a
manner reasonably likely to alarm the person receiving the threat, to inflict
bodily injury on the person or to commit a felony against the person, a member
of his family, or his property.  Tex.Pen.Code Ann. '
42.07(a)(2).

In
the first two paragraphs, the information alleged that Appellant, with intent
to harass, annoy, alarm, abuse, torment, and embarrass Doris Sipes, initiated a communication in writing and in the
course of the communication made an obscene comment, to wit:  that Doris Sipes
performed deviate sexual intercourse upon another woman and that she engaged in
sexual intercourse with an animal.  In
the third paragraph, the information alleged that Appellant, acting with the
same intent described in the first two paragraphs, threatened in writing, in a
manner reasonably likely to alarm Sipes, to inflict
bodily injury upon her.  The court=s charge instructed the jury consistent  with these
allegations.

Intent to Harass, Annoy, Alarm, Abuse, Torment, and
Embarrass








The
State is not required to prove a defendant=s
motive to establish the commission of an offense.  Bush v. State, 628 S.W.2d 441, 444 (Tex.Crim.App. 1982). 
Although Appellant acknowledges this rule, he nevertheless argues that
the State=s failure
to offer any evidence of motive renders the evidence factually insufficient to
establish his intent.  Appellant=s argument confuses the concepts of
motive and intent.  Rather than looking
at the existence of evidence tending to show Appellant=s
motive for harassing Sipes with these writings, our
sufficiency review is properly limited to the evidence showing whether he acted
with an intent to harass, annoy, alarm, abuse, torment, or embarrass her.  Intent is a fact question for the trier of fact, and it may be inferred from the acts, words,
and conduct of the accused.  Manrique
v. State, 994 S.W.2d 640, 649 (Tex.Crim.App.
1999); Wallace v. State, 52 S.W.3d 231, 234 (Tex.App.‑-El
Paso 2001, no pet.).  As a result
of its nature, mental culpability must generally be inferred from the
circumstances under which a prohibited act or omission
occurs.  Hernandez
v. State, 819 S.W.2d 806, 810 (Tex.Crim.App.
1991); Wallace, 52 S.W.3d at 235.

We
will first examine the sufficiency of the evidence demonstrating that
Appellant, acting with the requisite intent, initiated a communication in
writing and in the course of the communication made an obscene comment, to
wit:  that Doris Sipes
performed deviate sexual intercourse upon another woman and that she engaged in
sexual intercourse with an animal. 
Several of the letters Appellant sent to Sipes
discussed her engaging in sexual acts with a woman and with an animal.  He informed Sipes
that he had sent copies of these materials to other people, including Sipes=
ex-husband, so that they would know what she had done.  He also told her he intended to include all
of these materials in books that were being published.  From this evidence, a rational trier of fact could have concluded that Appellant initiated
the communications with the intent to harass, annoy, alarm, torment, or
embarrass her.  Appellant=s denial of having any such intent does
not render the evidence factually insufficient to support his conviction.








Turning
to the remaining allegation, the evidence is factually sufficient to show that
Appellant acted with the intent to harass or alarm Sipes
when he threatened to inflict bodily injury upon her.  The letter and inscription found in the Bible
contain many warnings that Sipes should be careful because
Appellant and God were watching her. 
Further, he told her that he knew where she would be holding an upcoming
Aritual,@
stating that there was only one way in and one way out, and he warned her of
bombs hidden under bonfires.  In a
separate writing, Appellant referred to Alightning@ striking at the church across the
street from Sipes=
office, and warned her that God might not miss her next time.  The jury could have believed that Appellant
was referring to the bomb threat made at St. Patrick=s.  The tone of all of the writings is extremely
threatening and filled with warnings of Sipes= impending death.  Despite Appellant=s
denial of any malicious intent, a rational trier of
fact could reasonably find that Appellant initiated the writings with the
intent to harass or alarm Sipes.  Consequently, the evidence is sufficient to
support Appellant=s
conviction for harassment.  Appellant=s sole point is overruled and the
judgment of the trial court is affirmed.

 

 

October 17, 2002

                                                                         


ANN CRAWFORD McCLURE, Justice

 

Before Panel No. 1

Larsen, McClure, and Chew, JJ.

 

(Do Not Publish)











[1]  Coyner, Harris, and Sipes did not
know one another prior to these events. 
Harris found Coyner=s telephone number because Appellant mentioned the
name of her publishing company in one of the letters.